# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW HAMPSHIRE

* * * * * * * * * * * * * * *
IN RE:
CHRISTOPHER C. DONIGIAN,  Case No: 08-12455-MWV
d/b/a EMCON BUILDERS,  Chapter 13
and SANDRA DONIGIAN,
      Debtors
* * * * * * * * * * * * * * *
LAWRENCE P. SUMSKI,
Chapter 13 Trustee,
      Plaintiff
v.                                            Adv. 10-1098-LHK
CHRISTOPHER C. DONIGIAN, d/b/a
EMCON BUILDERS, JACOB DONIGIAN,
DONIGIAN PROPERTIES, LLC,
a/k/a DONIGIAN PROPERTIES,
      Defendants
* * * * * * * * * * * * * * *

DEPOSITION OF

CHRISTOPHER C. DONIGIAN

This deposition taken at the Dahar Law

Offices, 20 Merrimack Street, Manchester,

New Hampshire, on Tuesday, March 15, 2011,

commencing at 10:00 a.m.

**ORIGINAL**

**CONNELLY
REPORTING & VIDEO SERVICES, INC.**
WORLDWIDE VIDEOCONFERENCING

32 GAULT ROAD                      BEDFORD, NH 03110
603-472-5745                      FAX 603-472-4969
www.nhdepositions.com

```
 1                        APPEARANCES

 2    For Christopher Donigian:

 3    DAHAR LAW OFFICE
      20 Merrimack Street
 4    Manchester, New Hampshire 03101
      By:  Victor W. Dahar, Sr., Esq.
 5         Eleanor W. Dahar, Esq.

 6    For Chapter 13 Trustee:

 7    SHEEHAN, PHINNEY, BASS + GREEN
      1000 Elm Street, PO Box 3701
 8    Manchester, New Hampshire 03105-3701
      By:  James S. LaMontagne, Esq.

 9
      Court Reporter:   Alix M. Godbout, LCR/RPR
10                      NH LCR No. 29 (RSA 331-B)

11    Also present:  Ms. Sweeney

12

13

14
                        STIPULATIONS
15
         It is agreed that the deposition shall be taken
16    in the first instance in stenotype and when
      transcribed may be used for all purposes for which
17    depositions are competent under the Federal Rules of
      Civil Procedure.
18
         Notice, filing, caption and all other formalities
19    are waived.  All objections except as to form are
      reserved and may be taken in court at time of trial.
20
         It is further agreed that if the deposition is
21    not signed within thirty days after submission to
      counsel for the deponent, the signature of the
22    deponent is waived.

23
```

```
 1                        I N D E X

 2   WITNESS

 3   Christopher C. Donigian

 4


 5   EXAMINATION                                        PAGE

 6   By Mr. LaMontagne................................4

 7


 8   EXHIBITS                                           PAGE

 9   1    11/28/06 payoff statement for $261,000.......22
     2    6/25/07 corrective warranty deed between
10        Donigian Properties and C. Donigian..........23
     3    9/5/07 HUD settlement statement..............25
11   4    9/8/07 payoff statement for $208,030.........27
     5    Copies of four checks........................30
12   6    11/2/07 check (copy) from Christopher
          Donigian to Donigian Properties, LLC,
13        for $40,000..................................31
     7    4/13/08 bill of sale for International
14        T-D 7 bulldozer..............................34
     8    4/26/04 warranty deed from Mr. and Mrs.
15        Donigian to Christopher Donigian.............37
     9    4/26/04 promissory note from Christopher
16        Donigian to Jacob Donigian...................42
     10   5/15/06 warranty deed from Christopher
17        Donigian to Jacob Donigian...................48
     11   5/15/06 warranty deed from Christopher
18        Donigian to Jacob Donigian, with notary
          seal.........................................55
19

20

21

22

23
```

| | | |
|---|---|---|
| 1 | Q. | So you have a special driver's license to be able |
| 2 | | to drive these trucks for them? |
| 3 | A. | Yes. |
| 4 | Q. | And what type of license is that? |
| 5 | A. | It's a commercial driver's license A called a |
| 6 | | CDLA. |
| 7 | Q. | And how long have you had that license for? |
| 8 | A. | Since I was 18. |
| 9 | Q. | And how old are you now, sir? |
| 10 | A. | Forty. |
| 11 | Q. | Prior to working for Charles George Company, what |
| 12 | | did you do? |
| 13 | A. | I had a -- I was building houses and doing |
| 14 | | remodeling and additions on my own. |
| 15 | Q. | And when you say on your own, did you have -- did |
| 16 | | you have a company or were you doing it as a sole |
| 17 | | proprietorship? |
| 18 | A. | Sole proprietor. |
| 19 | Q. | And what was the name of the -- what was the trade |
| 20 | | name of the sole proprietorship? |
| 21 | A. | Emcon Builders. |
| 22 | Q. | And where did the name "Emcon" come from? |
| 23 | A. | My daughter Emma and my son Connor. |

1  Q.  And how long were you building houses and, I
2      believe, you also said remodeling?
3  A.  Yes.
4  Q.  How long did you do that for?
5  A.  About five years.
6  Q.  So between 2004 and 2009?
7  A.  Yeah. It may have been 2002. I'm not -- I'm not
8      positive.
9  Q.  Do you know when Emcon was officially open for
10     business?
11 A.  It was some -- it was sometime -- it was sometime
12     in 2002, when I had -- I had my truck lettered.
13 Q.  Sir, are you on any prescription drugs or
14     medication today that might affect your ability to
15     tell the truth?
16 A.  No.
17 Q.  While you were working as Emcon Builders, how many
18     homes did you build?
19 A.  Seven.
20 Q.  And were all those homes built on lots that your
21     father owned?
22 A.  Those seven were, yes.
23         I'm sorry. I need to correct myself. I

1     withholding a certain amount of money until those
2     punch list items were completed?
3 A. Yes.
4 Q. Okay. I'd like to -- and you testified earlier that you built seven homes on lots that your father owned; correct?
7 A. Yes.
8 Q. Okay. Do you remember where those lots were?
9 A. Yes.
10 Q. Where were they?
11 A. There were five in Fremont and there were two in Allenstown.
13 Q. Do you know which homes came first, the ones in Fremont or Allenstown?
15 A. Yes. The ones in Fremont were first.
16 Q. So you built all five in Fremont first. And then, the last two homes were in Allenstown?
18 A. Yes.
19 Q. Okay. And the properties in Allenstown were on Chestnut Street?
21 A. That's correct. Chestnut Drive.
22 Q. Chestnut Drive. Thank you.
23     I'd like to focus in on the transactions that

1         buyer or buyer's bank?
2    A.   Yes.
3    Q.   Did your father also finance construction for the
4         seven lots that you built on?
5    A.   Yes.
6    Q.   Did he finance construction for all seven?
7    A.   Yes.
8    Q.   Did he tell you, prior to construction, how much
9         he was willing to finance for each particular
10        home?
11   A.   No.
12   Q.   So did you have a blank check from your father?
13   A.   No.  It would go a lot like it went with the bank
14        from the Mulcahy project.  I would -- when I'd
15        finish a certain aspect of the house, I would give
16        him a piece of paper asking for that amount of
17        money.
18   Q.   Okay.  But did your father ever say, for a
19        particular piece of property, "Chris, I know
20        you're going to build a Colonial.  It shouldn't
21        cost you any more than $150,000 to build, so
22        that's all I'm financing"?
23   A.   No.

| | | |
|---|---|---|
| 1 | | you? |
| 2 | A. | I don't. Just the date on the paper. I don't remember when he gave it to me. |
| 4 | Q. | Okay. As of the closing on 39 Chestnut Drive, was the property -- was the property construction completed? |
| 7 | A. | Yes. |
| 8 | Q. | And your father had financed -- your father didn't owe any more to you with respect to construction financing. |
| 11 | A. | Could you restate that, please? |
| 12 | Q. | Sure. As of the closing date on 39 Chestnut Drive -- strike that. |
| 14 | | After the closing date on 39 Chestnut Drive, your father didn't lend to you any further construction financing for 39 Chestnut Drive. |
| 17 | A. | No. |
| 18 | Q. | So, as of the closing on 39 Chestnut Drive, you owed your father $208,030. |
| 20 | A. | That's what it says. |
| 21 | Q. | Do you dispute that? |
| 22 | A. | No. I have to reason to. |
| 23 | Q. | Have you ever disputed an amount that your father |

1    MR. LaMONTAGNE: Okay. Could we mark that as
2    Exhibit No. 4, please?
3        (C. Donigian Exhibit 4 marked for Id.)
4  Q. (BY MR. LaMONTAGNE) Mr. Donigian, you'd agree with
5    me that what has been marked as Exhibit No. 4 is a
6    one-page document; is that correct?
7  A. Yes.
8  Q. And it appears to be dated September 8th, 2007; is
9    that correct?
10 A. Correct.
11 Q. Okay. And could you tell me what this document
12    is?
13 A. This is the payoff for lot 12, 39 Chestnut Drive
14    in Allenstown.
15 Q. And it's a payoff from whom?
16 A. My father.
17 Q. And the total payoff owed to your father is
18    $208,000 -- $208,030?
19 A. That's correct.
20 Q. And it notes that $140,000 has been paid; is that
21    correct?
22 A. Yes.
23 Q. Do you know when your father gave this payoff to

1  A. No.

2  Q. In those instances where there were not promissory
3     notes, how did you know how much the lot price
4     was?

5  A. Most of the time, he would just tell me in advance
6     what the lot was gonna cost.

7  Q. And did you -- did you expect to have to pay for
8     that lot at some point?

9  A. Yes.

10 Q. And when did you expect to have to pay for the
11    lot?

12 A. After closing.

13 Q. And how far after -- how long after closing would
14    you need to pay for the lot?

15 A. Normally, my father would give me -- either before
16    closing or after closing, he would give me a sheet
17    of paper that told me what I owed him.

18 Q. And but my question was: How long after closing
19    would you typically pay your father?

20 A. Normally, pretty much immediately after the check
21    would clear.

22 Q. Okay. And when you say "when the check would
23    clear," you're referring to the check from the

```
1    Q.   Okay.  So how did you know how much you could
2         spend in construction costs?
3    A.   Well, at the time we were building, there was just
4         -- you know, pretty much, in the back of my mind,
5         I knew what it was gonna cost me and what I was
6         gonna sell it for.  And I just took the draws as I
7         needed them, meaning I put in for the request as I
8         needed them.
9    Q.   Weren't you ever concerned that your construction
10        costs would exceed your father's ability or desire
11        to loan money to you?
12   A.   I was always concerned that I would not -- you
13        know, go over -- go over the limit, but I never
14        did.
15   Q.   Prior to construction on a particular home, you
16        had a purchase-and-sales agreement with the buyer?
17   A.   On the two that had -- I'm sorry.  On the three
18        that I had agreements on them, yes.
19   Q.   Okay.  And the four homes that you did on spec,
20        you had a design of a specific home that you were
21        going to build for those four lots?
22   A.   Yes.
23   Q.   The financing that your father provided to you,
```

```
 1          you knew this was -- that it was a loan; correct?
 2     A.   Yes.
 3     Q.   And you knew that he expected to be paid back.
 4     A.   Yes.
 5     Q.   And you expected to pay him back.
 6     A.   Yes.
 7     Q.   Do you know how he kept track of the money he lent
 8          to you?
 9     A.   Yes, from the -- from the paperwork I would give
10          him.
11     Q.   And so, at the -- so, every time a subcontractor
12          completed a portion of a job, you would submit,
13          essentially, an invoice to your father for a draw.
14     A.   It wasn't every time a subcontractor would finish.
15          It would be an aspect of the whole part of the
16          house.  It may be four or five subcontractors that
17          came into play, but, yes, that's what I would do.
18     Q.   Did you keep track of the expenses that you were
19          spending, your construction expenses that you were
20          spending on each one of the seven homes?
21     A.   Yes.
22     Q.   And how did you do that?
23     A.   From my invoices from the -- from the suppliers
```

# CERTIFICATE

I, Alix M. Godbout, a Licensed Shorthand Court Reporter and Notary Public for the State of New Hampshire, do hereby certify that the foregoing is a true and accurate transcript of the testimony of **CHRISTOPHER C. DONIGIAN**, who was duly sworn, taken at the place and on the date hereinbefore set forth, to the best of my skill and ability under the conditions present at the time.

I further certify that I am neither attorney or counsel for, nor related to or employed by any of the parties to the action in which this deposition was taken; and further, that I am not a relative or employee of any attorney or counsel employed in this case, nor am I financially interested in this action.

_____
Alix M. Godbout, LCR/RPR
(NH LCR No. 29)