# EXHIBIT B

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW HAMPSHIRE

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

IN RE:
CHRISTOPHER C. DONIGIAN,              Case No: 08-12455-MWV
d/b/a EMCON BUILDERS,                 Chapter 13
AND SANDRA DONIGIAN,
            Debtors
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
LAWRENCE P. SUMSKI,
Chapter 13 Trustee,
            Plaintiff
v.                                    Adv. 10-1098-LHK
CHRISTOPHER C. DONIGIAN, d/b/a
EMCON BUILDERS, JACOB DONIGIAN,
DONIGIAN PROPERTIES, LLC,
a/k/a DONIGIAN PROPERTIES,
            Defendants
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


DEPOSITION OF JACOB A. DONIGIAN

This deposition taken at the offices of

Sheehan, Phinney, Bass + Green, 1000 Elm

Street, Manchester, New Hampshire, on

Tuesday, March 8, 2011, commencing at

10:22 a.m.

CONNELLY
REPORTING & VIDEO SERVICES, INC.
WORLDWIDE VIDEOCONFERENCING

32 GAULT ROAD                         BEDFORD, NH 03110
603-472-5745                          FAX 603-472-4969
www.nhdepositions.com

1                          **APPEARANCES**

2      **For Jacob A. Donigian:**

3      MARSHALL LAW, PLLC
       47 Depot Road
4      East Kingston, New Hampshire   03827
       By:  Brian D. Kenyon, Esq.
5           Keri J. Marshall, Esq.

6      **For Chapter 13 Trustee:**

7      SHEEHAN, PHINNEY, BASS + GREEN
       1000 Elm Street, PO Box 3701
8      Manchester, New Hampshire 03105-3701
       By:  James S. LaMontagne, Esq.

9
       **Court Reporter:**  Alix M. Godbout, LCR/RPR
10                       NH LCR No. 29 (RSA 331-B)

11

12

13

14
                         **STIPULATIONS**
15
           It is agreed that the deposition shall be taken
16     in the first instance in stenotype and when
       transcribed may be used for all purposes for which
17     depositions are competent under the Federal Bankruptcy
       Rules.
18
           Notice, filing, caption and all other formalities
19     are waived.  All objections except as to form are
       reserved and may be taken in court at time of trial.
20
           It is further agreed that if the deposition is
21     not signed within thirty days after submission to
       counsel for the deponent, the signature of the
22     deponent is waived.

23

1                        I N D E X

2    WITNESS

3    Jacob A. Donigian

4    EXAMINATION                                    PAGE

5    By Mr. LaMontagne...............................4

6

7    EXHIBITS                                        PAGE

8    1    10/20/06 warranty deed from Donigian
          Properties to Christopher Donigian..........37
9    2    11/30/06 HUD settlement statement...........39
     3    11/28/06 payoff statement for $261,000......40
10   4    11/30/06 check (copy) from Starter Title
          Services to Donigian Properties, LLC, for
11        $261,000....................................43
     5    6/25/07 warranty deed from Donigian
12        Properties to Christopher Donigian..........45
     6    9/5/07 HUD settlement statement.............48
13   7    9/8/07 payoff statement for $208,030........49
     8    Copies of four checks.......................55
14   9    11/2/07 check (copy) from Christopher
          Donigian to Donigian Properties, LLC, for
15        $40,000.....................................56
10        9/17/07-10/15/07 Pentucket Bank statement for
16        Jacob A. Donigian and Janice A. Donigian.....57
11        9/1/07-11/30/07 TD Banknorth statement
17        Jake Donigian, d/b/a Donigian Properties.....58
12        4/13/08 bill of sale for International
18        T-D 7 bulldozer.............................64
13        4/26/04 warranty deed from Mr. and Mrs.
19        Donigian to Christopher Donigian............71
14        5/15/06 warranty deed from Christopher
20        Donigian to Jacob Donigian..................75
15        Town of Barnstead building permit...........78
21   16   4/26/04 promissory note from Christopher
          Donigian to Jacob Donigian..................91
22   17   4/26/04 mortgage deed from Christopher
          Donigian to Mr. and Mrs. Donigian...........97

23

1       **JACOB A. DONIGIAN, Sworn**

2       **EXAMINATION**

3    Q.   (BY MR. LaMONTAGNE)   Sir, could you please state

4         your full name for the record, please?

5    A.   Jacob A. Donigian.

6    Q.   And your address?

7    A.   134 Chester Road, Fremont, New Hampshire.

8    Q.   And have you ever been deposed before?

9    A.   Yes.

10   Q.   How many times?

11   A.   Once.  One time.

12   Q.   And was that one time in connection with ---

13   A.   With this bankruptcy.

14   Q.   Okay.  No other times before then?

15   A.   Not that I can remember.

16   Q.   And are you employed, sir?

17   A.   Self.

18   Q.   And what do you do?

19   A.   General contractor and developer.

20   Q.   And how long have you been doing that for?

21   A.   Since 1962.

22   Q.   Did you say "1962"?

23   A.   Yes.

1   Q.    And what is the name of your company?

2   A.    Since 2000, it's Donigian Properties, LLC.

3   Q.    And before it was the LLC?

4   A.    It was Jake Donigian Construction.

5   Q.    So it was Jake Donigian Construction from 1962 to

6        the year 2000?

7   A.    Yes.

8   Q.    And then, after the year 2000, it's been Donigian

9        Properties, LLC?

10  A.    That's correct.

11  Q.    Are you primarily a residential builder or a

12       commercial builder?

13  A.    Residential.

14  Q.    And do you -- do you build the houses yourself or

15       do you retain a builder to do that?

16  A.    I have not built any houses since 2000.  I'm just

17       a developer and sell lots and finance

18       construction.

19  Q.    Okay.  So for the past 11 years, you haven't built

20       a home.

21  A.    No, I haven't.

22  Q.    Okay.  Have you ever built a home on a lot owned

23       by someone else?

1    the street and say, "Do you want to build a

2    house?" So these were people I knew and, no, they

3    had no problem.

4    Q.  Okay. And -- well, let me ask you this. Maybe it

5        was a bad question.

6        Didn't they have a risk that, at the end of

7        the day, they would build a house on a lot that

8        you owned and you would show up as owner and

9        collect the proceeds from the buyer and they would

10       be left to sue you for what they did?

11   A.  If they did, I never heard about it.

12   Q.  Okay. All right. In those instances where you

13       did finance construction, in how many transactions

14       do you think you did that?

15   A.  Since when?

16   Q.  Since 2000.

17   A.  Since 2000. Oh, I'd say about at least thirty

18       times, thirty or 35 times.

19   Q.  Okay. And since 2000, how many sites have you

20       built? Not you, but have had properties built

21       upon.

22   A.  Let's see. About forty.

23   Q.  About how many?

1   A.    Forty.

2   Q.    Okay.  So in the past 11 years, you've had --

3          you've had forty lots in which builders have built

4          homes on.

5   A.    Yes.

6   Q.    And the majority of them, you have financed.

7   A.    Yes.

8   Q.    Okay.  And now, have you financed because these

9          builders couldn't get construction loans from a

10        conventional lender?

11  A.    That and, also, the prices that the banks were

12        charging with the points and everything were more

13        than I was getting.

14  Q.    Okay.  So you were collecting interest on your ---

15  A.    Yes, I was.

16  Q.    Okay.  Were you collecting interest on the

17        purchase of the lot, the balance that was due to

18        you?

19  A.    Sometimes.

20  Q.    And explain to me how you would finance a builder.

21        And, again, we're talking about all these builders

22        other than Emcon.

23  A.    Okay.

1  to do is I'd like to focus in on your actions with

2  the builders other than Emcon. Okay? So just

3  let's take them off the table for now.

4  A.  Okay.

5  Q.  Okay? When you sold a lot to a builder, did you

6  -- was it usually financed or did they pay you in

7  cash for the lot?

8  A.  I didn't have too many that paid for cash on the

9  whole thing. Most of the time, they gave me a

10  deposit of twenty or 25,000 and I would carry the

11  balance of the lot, along with financing the

12  construction.

13  Q.  Okay. Now, when you say you carried the balance

14  of the purchase price on the lot, did the builder

15  sign a promissory note?

16  A.  No. We just signed an agreement.

17  Q.  You signed an agreement?

18  A.  Yes.

19  Q.  Okay. And, typically, what would that agreement

20  say?

21  A.  That agreement would say the price of the lot, how

22  much the deposit was, and the balances due when

23  the house was transferred.

1  Q.  Okay.  Did you take a mortgage out against the

2      property to ---

3  A.  No, I didn't.

4  Q.  --- secure the agreement?

5  A.  No, I didn't.

6  Q.  And at the time that you signed this agreement,

7      did you transfer the lot into the builder's name?

8  A.  No, I didn't.

9  Q.  Okay.  So you retained ownership of the lot.

10 A.  That's correct.

11 Q.  Okay.  Were there any -- were there any instances

12     where you would just outright deed the lot to the

13     builder at the outset of your engagement?

14 A.  Only if they paid for the whole thing.

15 Q.  And I believe you testified earlier that didn't

16     happen very often.

17 A.  No, it didn't.

18 Q.  How many times do you think it happened?

19 A.  I would say, from 6,000, probably seven or eight

20     times.

21 Q.  Seven or eight times out of 6,000, did you say?

22 A.  Out of -- I'm sorry.  From 2000 till today.

23 Q.  Okay.  And how was the lot price arrived at?

1       collect on a balance that was owed to you?

2  A.   No.

3  Q.   At what point would you -- bad question.

4       Would you attend the closings in those

5       transactions where you owned the property and a

6       builder was building on that lot?

7  A.   No, because when they were closing, I didn't own

8       the property.  I would transfer them the property,

9       probably a week or so before the closing, and they

10      would take the deed and transfer it to whoever

11      they sold it for.  When they got paid, they would

12      pay me.

13  Q.   Okay.

14  A.   But I didn't attempt -- I didn't -- I don't think

15      I attended more than one or two out of thirty or

16      forty closings.

17  Q.   Okay.  Did these builders ever express concern to

18      you that they were building on your lot and they

19      didn't own the lot?  Didn't they have some risk

20      there?

21  A.   They probably did, but they couldn't get financing

22      anywhere else.  And I knew them.  We had good

23      relationships.  I just didn't pick somebody off

1   Q.   Okay.  You would cut checks to your builder.

2   A.   Yes.

3   Q.   And then, the builder would cut checks to his ---

4   A.   That's right.

5   Q.   --- subcontractors.  Okay.

6        How did you keep track of how much money you

7        would lend to a particular builder?

8   A.   Not very well, I guess.  It was just whatever I

9        had in my checking account.  Whatever checks they

10       had, I would go back and see what they got and I

11       could pretty well figure out if -- how much

12       they're taking and I'd give 'em whatever I said.

13  Q.   Okay.  So you would know -- what if you had a

14       builder that was building on two different lots?

15  A.   Well, the lot numbers would be on the check.

16  Q.   Okay.  So you would notate the check.

17  A.   Yes, and the stub.

18  Q.   Okay.  And so, you would not keep a running total,

19       then, of what you had lent out.

20  A.   More or less.  More or less, in my head, I would

21       know, you know.

22  Q.   Okay.  So, at the end of the day, when the house

23       is about to be sold, would you provide the builder

1    with an invoice?

2    A.  I would provide -- most of the time, I would

3        provide 'em with some kind of a figure on what

4        they owed me with the lot cost, how much they had

5        borrowed, and what their interest was gonna be and

6        just, you know, give 'em a bill for it.

7    Q.  And did you ever establish with the builder a,

8        we'll say, priority of payment plan?  Meaning, at

9        closing, if the builder didn't have enough to pay

10       the subcontractors, were you -- did it make a

11       difference -- were you the first one paid, no

12       matter what, or were you the last one paid, no

13       matter what?

14   A.  It all depended.  The time that -- the times that

15       they didn't pay me all the money, I was probably

16       the last one that they paid because they didn't

17       have enough.  But I would wait.  You know, I would

18       wait until they did have the money because, most

19       of the time, the bank withheld.  Like I said

20       before, they would have stuff that was not done.

21   Q.  Okay.  All right.  Did you ever have an

22       opportunity, when you were working with one of

23       these builders, where you conveyed property to the

1      builder and the sale didn't take place?

2  A.   Yes.

3  Q.   What happened?  How many times did that happen?

4  A.   I would say a half dozen times over the years.

5  Q.   And that's between 2000 and present day.

6  A.   Right.

7  Q.   Okay.  And what did you -- what did you guys do at

8      that point, you and the builder?

9  A.   I would just retain the property.

10  Q.   Okay.  So would he -- would the builder deed the

11      property back to you?

12  A.   He never got the deed.

13  Q.   Okay.  All right.  So I just want to clarify,

14      because my question was, was there ever a time

15      when you deeded property to a builder in

16      anticipation of a closing and the closing did not

17      take place.

18  A.   No.

19  Q.   Okay.  So that never happened.

20  A.   That never happened to me.

21  Q.   Okay.  All right.  Who was in charge -- in those

22      instances when you did deed a lot to a builder,

23      who was in charge of recording that deed?

1   A.   Which deed? The deed from me to them?

2   Q.   From you to the builder.

3   A.   From me to the builder, I was.

4   Q.   Okay. Did you ever -- were there any -- were

5        there ever any problems where you did not record

6        the deed in time for the closing?

7   A.   I don't remember, you know, that I ever dropped

8        the ball as far as recording it.

9   Q.   Okay.

10   A.   To a legitimate P&S agreement.

11   Q.   Did you ever forget to record a deed from you to a

12        builder?

13   A.   The only time I'd forget is if the deal did not go

14        through. Sometimes I would. But most of the

15        time, the builder was not involved. It was just

16        transferring a lot that I probably just put the

17        deed someplace and I didn't record it only two or

18        three times that I know.

19   Q.   Okay. Now, I'd like to shift focus a little bit

20        and talk about the relationship that you had with

21        Emcon Builders, as a developer.

22   A.   Okay.

23   Q.   Okay? Was it the same type of process that you

1      had with the other builders that you worked with?

2  A.  Basically, it was, yes.

3  Q.  What were the -- were there any differences?

4  A.  Well, sometimes I did not take a deposit, where he

5      was my son, and sometimes I didn't charge him

6      interest.

7  Q.  Sometimes you didn't charge him...?

8  A.  I didn't charge him interest.

9  Q.  Okay.  How many transactions did you have with

10     your son?  And when I say "transactions" -- again,

11     bad question.  I apologize.

12         How many lots did you ---

13  A.  How many lots.

14  Q.  --- give to your son to build upon?

15  A.  Wait a minute.  One, two, three -- five, six --

16     seven or eight.

17  Q.  Okay.  And I think five were in Fremont and two in

18     Allenstown?

19  A.  Yes.

20  Q.  Is that correct?

21  A.  Yes.

22  Q.  Okay.  And of those seven transactions, did your

23     son ever sign a promissory note for the lot?

1　　　price.

2　Q.　And he never said, "Dad, that's too much for the

3　　　lot.  I can't build on it for that price."

4　A.　No, because then he wouldn't be building on it.

5　Q.　Okay.

6　A.　I really did not overcharge him for anything.

7　Q.　I'm not suggesting you did.

8　A.　No, I really didn't.

9　Q.　Did you finance every one of those seven

10　　　transactions for your son?

11　A.　Yes.

12　Q.　And was it -- the financing with your son, was it

13　　　similar to the financing with the other builders

14　　　where he would come to you after something has

15　　　been done, such as the foundation, and you would

16　　　then pay him?

17　A.　Yes.

18　Q.　And then, he would pay the subcontractors?

19　A.　He was -- it was his job to pay the subcontractors

20　　　and the materials.

21　Q.　Okay.  Did he ever make his request for financing

22　　　in writing to you?

23　A.　I think a couple of times.  Yeah, some of the

1   A.   I think he must have once or twice, but not at the

2         end I don't think he did.

3   Q.   Okay.  Why only once or twice and not every time?

4   A.   I haven't any idea.  I just thought -- I didn't

5         require him or I didn't ask him to do it.  He just

6         didn't do it.

7   Q.   Okay.  Did you ever have an agreement with your

8         son, as you did with the other builders, that sort

9         of laid out the terms of deposit, how much is left

10        to be paid, and when it's going to be paid?

11   A.   A lot of times not on paper.

12   Q.   Okay.  So you had an oral agreement with your son?

13   A.   Yes.

14   Q.   Okay.  And, typically, what was your oral

15        agreement with your son for these seven

16        transactions?

17   A.   At first, a couple, I think he gave me a deposit.

18        After that, he didn't have a deposit.  He just

19        said, "I've got a customer for this home and I'd

20        like to build on it," and we started from there.

21        And I says, "Well, the price of the lot is such

22        and such and, you know, what type -- how many

23        square foot house are you building" and this and

1  Q.  Okay.. So May or June of '07, that is when he

2      promised to pay you $95,000 for the lot.

3  A.  Yes.

4  Q.  Okay. And then, it was between May and June and

5      September 5, the closing date, that he incurred

6      the $100,000 in construction financing.

7  A.  Yes.

8  Q.  Okay. And you provided -- why did you provide him

9      with this payoff statement?

10 A.  I can't answer that. I usually had one of these.

11     That one there was -- this one here was, must have

12     been done by my wife.

13 Q.  Okay.

14 A.  Because that's all typed up. I don't know. I

15     think she did that.

16         MR. KENYON: What's the number?

17         THE WITNESS: Okay. That's Exhibit 3.

18 Q.  So you're saying that Exhibit 3 was prepared by

19     your wife?

20 A.  Yes.

21 Q.  Would she have prepared it at your direction?

22 A.  She probably found one of these papers and just

23     typed it up.

1   A.   Yes.

2   Q.   Okay.  All right.  I'm going to show you -- I'm

3        going to show you a document and ask you if you

4        recognize it.

5   A.   Yeah.

6   Q.   Okay.

7   A.   This looks like the same lot.

8   Q.   And what is the document that you're holding right

9        now?

10  A.   It's a settlement statement.

11  Q.   And is it a settlement statement for 39 Chestnut

12       Drive?

13  A.   Yes.

14            MR. LaMONTAGNE:  Okay.  Could we mark that as

15       Exhibit 6, please?

16            (Discussion was held off the record.)

17            (J. Donigian Exhibit 6 marked for Id.)

18  Q.   (BY MR. LaMONTAGNE)  Mr. Donigian, will you agree

19       with me that the closing on 39 Chestnut Drive took

20       place on September 5, 2007, as indicated by the

21       distribution date in -- near box H?

22  A.   Yes, it seems to.

23  Q.   Okay.  I want to ask you -- I'm going to give you

1  Q.  Okay.

2  A.  You know, and this one here, it was more involved,

3      so I think I just wrote it out and I must have

4      given this to Chris.

5  Q.  Okay.  But the point being is that this is what

6      you -- the total, $208,030, that's what you

7      expected to be paid at closing on 39 Chestnut

8      Drive.

9  A.  Definitely.

10 Q.  Okay.  And as far as Exhibit 3 is concerned, even

11     though your wife put it together, you expected to

12     be paid $261,000 at the closing for lot 31, 32

13     Chestnut Drive.

14 A.  Yes.

15 Q.  Okay.  Do you remember if you were paid $208,000

16     at the closing on 39 Chestnut Drive?

17 A.  No.  It looks like 140 right here.

18 Q.  Okay.  So ---

19 A.  I got paid 140.

20 Q.  Okay.  So you were paid 140 of the $208,000?

21 A.  Yes, I was.

22 Q.  And the balance due is approximately $68,000?

23 A.  Yes.

1    another document and ask you if you recognize

2    that.

3    A.    Yes.    That's my scribbling.

4    Q.    And could you tell me what that document is?

5    A.    This is the total owed on -- what he owed me for

6    39 Chestnut Drive.

7    Q.    Okay.  And what is it dated?

8    A.    September 8th.

9    Q.    Okay.

10   A.    Of '07.

11        MR. LaMONTAGNE:  I'd like to mark that as

12        Exhibit 7, please.

13            (J. Donigian Exhibit 7 marked for Id.)

14   Q.    (BY MR. LaMONTAGNE)   And so this, what has been

15        marked as Exhibit 7, a payoff, the lot was

16        $95,000; is that correct?

17   A.    Yes, it is.

18   Q.    And the loan that is listed as $100,000, was that

19        for financing?  Excuse me.  Was that for

20        construction financing?

21   A.    That was for construction, yes.

22   Q.    Okay.  And what is "Aggregate"?

23   A.    I must have hauled some material, like stone and

1    Q.    Have you ever been paid that $68,000?

2    A.    No.

3    Q.    Do you remember when you were paid that $140,000?

4    A.    If I remember, it was two separate payments.  I

5          think it was either 140 or 90 and 50, something

6          like that.

7    Q.    Okay.  I want to show you a copy of a check.

8                Now, what I'm showing Mr. Donigian is a

9          single page with four checks on it.  And I'm going

10         to direct his attention to the top check and ask

11         him if he recognizes the copy of that top check.

12   A.    Yes.

13   Q.    Okay.  And what is that, sir?

14   A.    That's partial payment for lot 12.

15   Q.    Okay.  So the top check -- why don't we mark it as

16         an exhibit, please.

17              (J. Donigian Exhibit 8 marked for Id.)

18   Q.    (BY MR. LaMONTAGNE)  Okay.  So, Mr. Donigian, on

19         Exhibit 8, the check at the top of the page is

20         checked 3439; is that correct?

21   A.    Yes.

22   Q.    And it's made payable to Donigian Properties?

23   A.    That's right.

1   Q.   And that's you?

2   A.   Yes, it is.

3   Q.   Okay.  And it's for $100,000; is that correct?

4   A.   That's correct.

5   Q.   Okay.  And it's dated September 11, 2007?

6   A.   Yeah.

7   Q.   Okay.  And it's your testimony that this payment

8       was made by Emcon Builders to Donigian Properties,

9       a partial payment for the moneys owed to Donigian

10      Properties for 39 Chestnut Drive.

11  A.   Yes.

12  Q.   Okay.  I'd like to show you another document and

13      ask you if you recognize that.

14  A.   Yes, I do.  There's the $40,000.

15  Q.   Okay.  And what is -- can we mark that as Exhibit,

16      I think, 9, please?

17            (J. Donigian Exhibit 9 marked for Id.)

18  Q.   (BY MR. LaMONTAGNE)  Okay.  So Mr. Donigian, what

19      has been marked as Exhibit 9, that's an Emcon

20      check to Donigian Properties; is that correct?

21  A.   That's correct.

22  Q.   And it's for $40,000; correct?

23  A.   Correct.

1   Q.   All right.  Is that an additional partial payment

2       for 39 Chestnut Drive?

3   A.   Yes, it is.

4   Q.   Okay.  And that was to pay -- that was a payment

5       on the $208,000 that you owed -- that Emcon owed

6       Donigian Properties as of September 5, 2007.

7   A.   Yes.

8          I hope you don't have one there for 68,

9       because I never got it.

10   Q.   No, I don't.

11   A.   Phew.  I thought I lost my mind.

12       MR. KENYON:  And $68,000.

13       THE WITNESS:  I know.

14   Q.  (BY MR. LaMONTAGNE)  There you go.  I'm going to

15       show you another document and ask you if you

16       recognize that.

17   A.   Yeah.  That's my account.

18       MR. LaMONTAGNE:  Okay.  Could we mark that as

19       Exhibit 10, please?

20       **(J. Donigian Exhibit 10 marked for Id.)**

21   Q.  (BY MR. LaMONTAGNE)  Now, what I'd like to do is

22       I'd like to look at Exhibits 8 and 10.  And before

23       we go any further, could you tell me what Exhibit

1       10 is, please?

2   A.  Exhibit 10 is my monthly statement.

3   Q.  Okay.  And that's a personal bank statement as of

4       October 15, 2007?

5   A.  Yes, it is.

6   Q.  Okay.  At Pentucket Bank?

7   A.  That's right.

8   Q.  Okay.  And that's your personal account?

9   A.  That's my account where all my money goes.

10  Q.  Okay.  You'll see, under "Transaction Detail,"

11      that, on September 17, there was a deposit of a

12      hundred-thousand-dollar check.  Do you see that?

13  A.  Yes, I do.

14  Q.  Okay.  Is that deposit the deposit of the check

15      from Emcon Builders?

16  A.  Yes, it is.

17  Q.  Okay.  I'll show you yet another document.  I'm

18      going to ask you if you recognize that.

19  A.  Yeah.  This is a statement, also, from the bank.

20          MR. LaMONTAGNE:  Okay.  Could we mark that as

21      Exhibit 11, please?

22          (J. Donigian Exhibit 11 marked for Id.)

23  Q.  (BY MR. LaMONTAGNE)  Now, Mr. Donigian, this is --

1        is this also a bank statement of yours?

2  A.   Yes, it is.

3  Q.   Okay. And under "Deposits," it states, on 11/2, a

4        deposit of $40,000; is that correct?

5  A.   Yes.

6  Q.   Okay. And that notation that's handwritten next

7        to it, "Lot number 12," I think it says "Woodridge

8        E-S-T," did you write that?

9  A.   No.

10  Q.   Okay. Is the $40,000 deposit the check that was

11        sent to you by Emcon Builders for 39 Chestnut

12        Street -- excuse me -- 39 Chestnut Drive?

13  A.   Yes.

14  Q.   And lot number 12 in Woodridge Estate, that's

15        actually 39 Chestnut Drive; correct?

16  A.   That's correct.

17  Q.   Okay. After you made the construction loan to

18        Emcon for 39 Chestnut Drive, did you loan any

19        further money to Emcon Builders?

20  A.   Not for lots, I don't think.

21  Q.   Did you loan money to Emcon Builders for anything?

22  A.   I think I gave him some checks, some money for

23        certain things that he had to do, but I don't

1   Q.   When did you ask your son to transfer the lot back

2        into your name?

3   A.   I think it was about the time we were going to get

4        the permit.

5   Q.   About the time ---

6   A.   '06.

7   Q.   Okay.

8   A.   In '06.

9   Q.   I'm going to show you a document and ask you if

10       you recognize it.

11  A.   That says '08, yeah.

12        Yeah, it was '06.  This was recorded in '08.

13  Q.   Okay.  Do you recognize the document, sir?

14  A.   Yes.

15       MR. LaMONTAGNE:  Okay.  Could we have it

16     marked as Exhibit 14?

17        (J. Donigian Exhibit 14 marked for Id.)

18  Q.   (BY MR. LaMONTAGNE)  Okay.  So, Mr. Donigian,

19       Exhibit 14 is a two-page document; correct?

20  A.   That's correct.

21  Q.   And it is a deed from Christopher Donigian to you,

22       individually; is that correct?

23  A.   That's correct.

1       times he did. He put something on paper that he

2       wanted so much for a draw. But, you know, it was

3       just -- I don't think I ever recorded any of it,

4       because I was doing the same thing. I was keeping

5       everything in the checking account, just counting

6       the steps.

7  Q.  So you kept track of how much you were financing

8       your son by your checkbook, essentially.

9  A.  That's correct. Because he got no cash. All he

10      got was checks, so...

11  Q.  And every check was notated with the specific lot

12      number that he was working on.

13  A.  That's correct.

14  Q.  So, if he was working on more than one lot, you

15      could differentiate between lot 12 and lot 13, as

16      far as expenses were concerned.

17  A.  Definitely.

18  Q.  Okay. And your son always knew that, when you

19      financed his construction, that this was, in fact,

20      a loan from you to him.

21  A.  Yes.

22  Q.  It was not a gift.

23  A.  No.

1   Q.   Okay. And that you expected to be repaid.

2   A.   Yes.

3   Q.   And I assume it was -- and I assume, as with the

4        other builders, when you were conducting business

5        with your son, you maintained ownership of the

6        property.

7   A.   Yes, I did.

8   Q.   Okay. At what point did you transfer ownership of

9        the property to your son?

10   A.   The same as the others: Mostly it was probably a

11        week before.

12   Q.   Let me ask you this. Why just not show up at the

13        closing and sell the property yourself, as owner?

14   A.   Because I didn't want to be the one that

15        transferred the lots. In case there was something

16        wrong with the house, they could not come back to

17        me and say, "My dishwasher's not working." That

18        was what my attorney was saying back then. You

19        know, that's the only reason I stayed out of it.

20            I went to a few other closings years ago,

21        before I did that, and I kept the lot in my name.

22        I transferred it directly to the customer. And

23        the attorney at that time says, "That's not a very

1  **CERTIFICATE**

2

3      I, Alix M. Godbout, a Licensed Shorthand

4  Court Reporter and Notary Public for the State of New

5  Hampshire, do hereby certify that the foregoing is

6  a true and accurate transcript of the testimony of

7  **JACOB A. DONIGIAN**, who was duly sworn, taken at the

8  place and on the date hereinbefore set forth, to the

9  best of my skill and ability under the conditions

10  present at the time.

11      I further certify that I am neither attorney

12  or counsel for, nor related to or employed by any

13  of the parties to the action in which this

14  deposition was taken; and further, that I am not

15  a relative or employee of any attorney or counsel

16  employed in this case, nor am I financially

17  interested in this action.

18

19

20  _____

21  Alix M. Godbout, LCR/RPR
    (NH LCR No. 29)

22

23